UNDERHILL *vs.* ATWATER and others.

1. A mortgage that has been satisfied and delivered up to the mortgagor without being canceled, may be again delivered as a valid security by the mortgagor, and such new delivery gives it new vitality against the mortgagor, but not as against intervening encumbrancers.

2. The mortgage of a married woman given as collateral security for the debts contracted by the brother of her husband in continuing and preserv-

ing the former business of her husband for his benefit, is satisfied and discharged by the release of the brother from such debts. It cannot be pledged by her husband for another purpose without her authority.

3. But when the brother was discharged from his debts on condition that the assets of the business should be assigned by him in payment of them, and that the creditor should retain the mortgage as security for the payment of the debts so assigned, such retention of the mortgage is for the purpose for which it was given, collateral security for the debts of the husband's brother; and the husband would have power to continue the mortgage for that purpose without further consent of his wife, were it not that by this arrangement she could no longer call upon the brother, for whom alone she was surety.

4. Although no express power is given to use or pledge a mortgage for a particular purpose, such power may be inferred from the circumstances of the case, the situation of the parties, and the general object for which the mortgage was given.

5. A complainant to whom a mortgage has been assigned as security for a specific debt, can only have a decree for that debt, although pending the foreclosure suit the whole mortgage is absolutely assigned to him. His remedy for the residue must be by supplemental bill or petition for surplus.

---

This suit was for the foreclosure of a mortgage given by the defendants, William Atwater and Margaret his wife, upon the premises of Margaret, to Gaston Lemercier, for $8000; this was assigned by Lemercier to the complainant. The defendants claim that this mortgage was given without consideration to them, but to accommodate James B. Atwater, as collateral security for a loan made by Lemercier to him, and that this loan was paid and satisfied by J. B. Atwater to Lemercier before he assigned the mortgage to the complainant.

*Mr. F. B. Ogden,* for complainant.

*Mr. E. M. Shreve* and *Mr. B. F. Watson,* (of New York) for defendants.

THE CHANCELLOR.

The defendant, William Atwater, was engaged in mercantile business in New York, and in November, 1866, being embarrassed, assigned all his business and effects to Gaston

Lemercier, for the benefit of his creditors. In February, 1867, Lemercier sold and transferred the whole of the property, with the store and business, to James B. Atwater, the brother of William; James paid the full consideration of the sale and became the legal owner of the property. He continued to hold it, and continued the business in the store until March 5th, 1868, when he sold the stock, business, and assets to Lemercier. Although James was the lawful and actual owner of the store and business, without any express or resulting trust, or any other trust for William, and had at any time the power to dispose of the whole at his own pleasure and for his own benefit, yet there was evidently an understanding that he was continuing the business with the intention of passing it over to William if he should become free from his debts. James, while he was the real owner and acted as such, allowed William to direct and control the business, and received out of the proceeds a salary of $1500 as salesman, and performed the duties of a salesman. And on the 19th of February, 1867, James gave to Lemercier a written declaration that he agreed to carry on the business for the use of William, who had been unfortunate, and by which he agreed to transfer the business to William whenever he might require it.

James, whilst he carried on the business, needed money, which he borrowed at different times from Lemercier, and which, in the whole, exceeded $11,000. In July, 1867, Margaret Atwater, with her husband William, executed to Lemercier a mortgage upon her residence in Bergen county, a farm of about forty acres, conditioned for the payment of $8000, which was given as security for the money advanced by Lemercier to carry on the business. Lemercier, who was in Europe at the execution of this mortgage, upon his return was dissatisfied with it, because it had not in it the usual interest clause; on that account it was given up; and on the 11th of January, 1868, the mortgage set out in the bill was given by Mrs. Atwater and her husband, conditioned for the same sum as the first mortgage, and including the

same premises. This was delivered to Lemercier for the same object, that is, as collateral security for the loans of money made to James by Lemercier, for the purpose of this business.

In March, 1868, the business of this store not having been prosperous was again embarrassed. The liabilities exceeded the assets by several thousand dollars, and the advances by Lemercier exceeded the mortgage to him by more than $3000, and James was not disposed or not able to advance any more money for the object. In this situation William, acting for James, but without his knowledge or authority, began a negotiation with Lemercier to sell out the concern to him. A bargain seems to have been agreed upon by them on the 4th of March, 1868, that Lemercier should take the whole stock of goods at the valuation of $8000, and take the other assets of the firm, and out of them pay the debts, as far as they would extend. James, when this agreement was communicated to him, refused to agree to it, and said that he would not transfer the property and business at all, unless he should be entirely freed from all debts and liabilities on account of it. A new agreement was thereupon made between him and Lemercier, which was reduced to writing, and executed by them under their hands and seals, and is dated March 5th, 1868. By this James assigned and transferred to Lemercier all the property and assets of that business, including the notes and book accounts, and Lemercier agreed to pay all the debts which James owed on account of that business. So far there is no dispute about facts.

Lemercier says that he refused, in his negotiation with William, to assume the debts, unless it should be agreed that he might retain the mortgage as collateral security for the payment of the debts due to James, which were to be transferred to him, and that William agreed that he might retain the mortgage for that purpose, provided the valuation of the merchandise was increased by about the sum of $3000. That James took no part in this arrangement

about the mortgage, and did not, so far as he was aware, know of it. Lemercier says, under this understanding he signed the agreement with James, and that without it he would not have signed it.

William denies all this, and says that there was no agree-ment or understanding whatever about retaining this mort-gage, before the agreement between James and Lemercier was signed and fully executed. He says that after the sale on the same day, Lemercier remarked to him, "suppose these accounts are not all paid," and that he told Lemercier to hold the mortgage as security; and that this is the only authority he gave to hold the mortgage.

The question, whether the agreement that Lemercier might retain the mortgage as collateral security was made during the negotiations for the transfer and was part of that arrangement, or whether it was only a volunteered sugges-tion by William after the sale was completed, and without consideration moving to him or his wife, may be an import-ant one. It is a mere question of the credibility of evidence. On the one hand, Lemercier, Henry C. Johnson, and Linds-ley Underhill, who were present at the negotiation, say pos-itively that this was part of the bargain for the transfer agreed upon by William Atwater and Lemercier before the execution of the agreement between James and Lemercier. They are contradicted by William Atwater and by him only; no other witness has any knowledge of the fact. Johnson, at least, is entirely disinterested, and beyond any known influence or bias. And his manner of giving in his testi-mony inclines me to give him credit. There is nothing, so far as I can discover in the attending circumstances, to throw doubt upon or discredit the story of these three wit-nesses; on the contrary, it seems to me to be the most probable version of the transaction. I feel compelled to be-lieve the statement of these three witnesses, and to assume as a fact for the decision of the case, that William agreed with Lemercier, pending the negotiations for the transfer, that this mortgage should remain as security for the pay-

ment of the accounts and notes assigned, and that this agreement was a consideration which induced Lemercier to enter into the agreement.

There can be no doubt but that a mortgagor may again use or negotiate a mortgage which has been satisfied and paid off and delivered to him, except as against intervening securities. The delivery of any instrument by the grantor gives it efficacy, and if he take a paper, executed and once used for another purpose, its re-delivery gives it again vitality. But such re-delivery must be by the mortgagor or grantor, and as in this case the real mortgagor is Mrs. Atwater, the owner of the mortgaged premises, the re-delivery or re-pledging must have been by her or some one authorized by her. Neither her husband nor any one else could take this or any other security which was paid or extinguished, and without her authority put it in circulation and thus give it vitality.

This matter involves two questions—first, whether this mortgage was paid or discharged, and, secondly, if it was, whether her husband had authority, express or implied, to authorize Lemercier to retain it, or to re-pledge it.

The mortgage was never canceled or delivered up. There was no agreement that it should be considered paid or surrendered. On the contrary, the agreement was that it should be retained as an existing security, and that substantially for the debt for which it was originally given. It was given to secure the money loaned by Lemercier—that money was not paid—it is not yet paid. He agreed to take the assets of James, including the accounts and notes, in payment of all the debts due to him from James, provided this mortgage remained as security for those accounts and notes. That is, if enough was not realised from those accounts and notes actually to pay the debt, the mortgage should still be liable; James only was to be discharged. The mortgage was not taken up, nor was it re-pledged. Nor was it pledged for a different debt, but it remained pledged for the same debt on other terms and conditions. But these altered con-

ditions essentially changed the substance of the contract on which it was pledged. When pledged for the debt of James he was the principal, and the mortgage the security; and Mrs. Atwater, if she had to pay, could look to James, the brother of her husband, for re-payment. As it was when changed, she could look for re-payment only to a great number of small debtors to the concern, probably for the most part unknown to her, and also irresponsible. The party for whom she was security was entirely different. This change in the object for which the mortgage was given, was material, and could not be made by her husband without her authority.

Mrs. Atwater and her husband both testify that she never authorized him to re-pledge this mortgage in any way; their evidence is uncontradicted and must be believed. I have no doubt that no express authority was given by her to pledge this mortgage for any new object. The only authority given to him was that originally given when she executed the mortgage, and handed it to him to pledge to Lemercier for moneys advanced and to be advanced by him to James in this business. To ascertain that authority we must look both to the testimony and to the circumstances under which the mortgage was made and given. Mrs. Atwater had received from her husband a valuable property in her own name; he failed, and had no property and no business; his brother James fairly bought his store and business; the title was in James, but he, out of kindness to his brother, was willing to assume it and all the risks and liabilities, for the purpose of preserving it for William, and if successful, transferring it to him when he should be in a condition to assume it in his own name. Money became necessary, and this mortgage was given to procure the necessary money. Mrs. Atwater executed it and entrusted it to her husband to negotiate for that purpose. He testifies that in making and originally negotiating that mortgage, he was the agent of his wife. This was evidently so, and is no where denied. And it does not appear in the evidence that this general

agency for negotiating that mortgage was limited to any particular terms; or that if he had negotiated it to Lemercier as the sole security for moneys advanced to that business without any personal liability of James, it would have been against his instructions, or in excess of his authority. The only question in this part of the case seems to be, whether William had authority to agree that this mortgage should continue after James was personally discharged. It was equitable when James, at the request of William, transferred a business into which he had entered for his benefit, that he should ask to be freed from the debts of the concern, so as to go out free from embarrassment. There was no injustice in having the mortgage of Mrs. Atwater, which was already liable for these debts, and could not be extricated otherwise as the concern was insolvent, still liable for any deficiency of the assets to pay these debts. Lemercier, in assuming the debts of the concern, then insolvent, was, in equity, entitled to retain this mortgage as security for the debts for which it was originally given. And William, who was the agent of his wife in negotiating that mortgage and arranging for its payment, made an arrangement within his power when he permitted it to be continued as security for the debt to Lemercier, providing that all the assets of the business should be first applied before the mortgage was called upon. Whether this was a more beneficial arrangement than to permit her to retain her recourse to James, does not appear.

The agreement with James cannot be affected; he had nothing to do with that concerning the retention of the mortgage; the agreement of Lemercier in effect discharged his debt, and by discharging the debt for which the mortgage was collateral would have discharged that, had it not been for the agreement that it should be retained. And it would not be equitable to permit Mrs. Atwater to claim that her mortgage is discharged by an agreement, or by the legal effect of an agreement, of which one of the stipulations was

that it should be retained. If she claims the benefit of this agreement made by her agent, she should not be allowed to repudiate its conditions.

But irrespective of this equity, I am of opinion that the whole evidence, and the circumstances surrounding the transaction, show abundantly that Mrs. Atwater confided the whole matter of negotiating this mortgage to her husband, and that without any specific limitations; and that continuing it as collateral security for Lemercier's advances after James was discharged, was within the scope of that authority.

Of course the complainant only can hold the mortgage for the deficiencies in the payment of the notes and accounts assigned by James B. Atwater to Lemercier.

Lemercier at first assigned the mortgage to the complainant as security for $4000, for which he had given his note. This was the only interest of the complainant at the time of filing the bill. Since then the mortgage has been assigned to him unconditionally, for a valid consideration. But in this suit the complainant can now have relief only upon his interest in the mortgage, as stated in the bill, and as it existed at the commencement of the suit. The decree can be only for the $4000, to secure which the mortgage was assigned to him. If he desires to have a decree for the residue of the mortgage assigned to him pending the suit, it can be had upon a supplemental bill filed for that purpose. Or if the whole premises should be sold on a decree in this suit as it is, he might have adequate relief upon application for the surplus.